Filed 9/26/23

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

TORY PALMER BRATTON,

    Defendant and Appellant.

E078627

(Super.Ct.No. FWV07728)

OPINION

APPEAL from the Superior Court of San Bernardino County. Daniel Detienne, Judge. Affirmed.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Robin Urbanski, Alan L. Amann, Juliet W. Park, A. Natasha Cortina, Felicity Senoski and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

---

    *    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part VI.C.2.

At the age of 16, defendant Tory Palmer Bratton confessed to robbing a local market, with an accomplice, shooting the clerk dead, and taking $184.  At his trial, his counsel argued that defendant's confession was false and that he did not participate in the robbery at all.  However, trial counsel did *not* argue that, *even if* defendant *did* participate, he was not the shooter.  Defendant was convicted of (among other things) first degree murder, with a personal firearm use enhancement and felony-murder special circumstances.  He appealed; we affirmed.

When defendant filed a petition to vacate the murder conviction under Penal Code section 1172.6,[1] the trial court denied it; it ruled that our opinion in defendant's direct appeal showed that he was the actual killer.

The People concede that this was error.  In ruling on a section 1172.6 petition, a trial court is not allowed to consider facts stated in an appellate opinion.  They contend, however, that the error was harmless because the record of conviction establishes that defendant was the actual killer.

Anticipating this response, defendant contends that, under standard principles of issue preclusion (a/k/a collateral estoppel), preclusion does not apply here because:

---

[1]    All further statutory citations are to the Penal Code unless otherwise specified.

The petition was actually filed under former section 1170.95.  (Stats. 2018, ch. 1015, § 4, amended by Stats. 2021, ch. 551, § 2.)  Effective June 30, 2022, however, former section 1170.95 was renumbered as section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will use section 1172.6, somewhat anachronistically, to refer to whichever one of the two statutes was in effect at the relevant time.

(1)  Whether defendant was the shooter was not actually litigated.

(2)  Trial counsel had an incentive not to contest whether defendant was the shooter.

(3)  The significance of whether defendant was the shooter was small at trial but, due to the then-unforeseeable enactment of section 1172.6, has since become great.

(4)  Section 1172.6 is a significant change in the law that warrants reexamination of whether defendant was the shooter.

We agree that standard principles of issue preclusion apply here.  However, we hold that the issue of whether defendant was the shooter was actually litigated.  Moreover, trial counsel did have an incentive to contest this issue; evidently, he simply made a tactical decision not to.  Because trial counsel did have an incentive to contest the issue, it does not matter that it was unforeseeable that the issue would have additional future consequences.  And finally, while section 1172.6 is a significant change in the law, the Legislature intended that it not constitute an exception ipso facto to issue preclusion.

I

STATEMENT OF FACTS

A.  *The Area of the Crime*.

Defendant's arguments require an understanding of the layout of the area of the crime.  The exhibits that we have include two aerial views of the scene.  However, due to the age of the case, two other exhibits that were maps of the scene have been destroyed.  Defendant asks that in lieu of the missing exhibits, we consider a current Google Maps

view of the area. We deem this to be a request for judicial notice of a Google Maps view of the area, which is granted. (See Evid. Code, §§ 452, subd. (h), 459, subd. (a); see also *United States v. Perea-Rey* (9th Cir. 2012) 680 F.3d 1179, 1182, fn. 1.)

The area involved is the southeast corner of Mountain Avenue (north-south) and I Street (east-west) in Ontario. On the corner itself, there was a gas station. Immediately east of that was the I Street Market, and immediately east of that was an alley running north-south.

On Mountain, south of the gas station, there was a Taco Bell, and south of that, a McDonald's. The alley ran behind (i.e., east of) both of these businesses.

Behind the McDonald's, on the other side of the alley, there was an apartment complex, made up of 823 and 827 Palmetto Street. Between the two buildings, there was a small triangular area. On the night of the crimes, a white pickup truck was parked in that triangular area. There was also a wrought iron fence, with a gate, between the two buildings.

B.    *The Arrival of the Police at the Scene*.

On June 14, 1995, around 8:40 p.m., a 911 operator answered a call but heard only "a moaning sound."

Also around 8:40 p.m., Ellen Trakes drove to an ATM on I Street, directly across from the market, to get cash. She saw three "kids," all male, come out of the market. Two of them, whose race she could not determine, ran east on I Street, toward the alley.

4

The third was Black, wearing a white tank top.  Trakes did not notice any of them holding anything.

After getting the cash, Trakes went to the market.  There she found the dead body of the clerk, Swindel "Sonny" Singh, lying behind the counter.  He had been shot once, in the left chest.  The bullet went through his heart, killing him.  Trakes picked up the store's phone to call 911, but found the 911 operator already on the line.

When the police arrived, the cash register drawer was open and the money tray was missing.  On the floor, behind the counter, they found one fired bullet and one bullet casing.  The casing was .380-caliber.  The bullet was fully jacketed and consistent with .380-caliber.  The presence of the casing meant that the gun was semiautomatic.  The bullet hit a tobacco display behind the counter, indicating that the shot was fired from the customer side of the counter while Singh was standing behind the counter, at the cash register.  In a planter south of the market, the police also found "fresh footprints."

C.    *Other Eyewitnesses*.

1.    *Irene Lopez*.

Irene Lopez lived in the apartment complex.  About 8:30 p.m., she was driving north through the alley to go home.  She saw three Black men and one Black woman standing in a planter area behind the I Street Market.  One man was wearing a white tank top.  The tallest man had something shiny.[2]

---

**2**      At the time, defendant was five feet six inches tall.

2.  *John Miranda.*

John Miranda also lived in the apartment complex.  Around 8:35 p.m., he was at a payphone at the McDonald's when he heard two backfires coming from the north.

Seconds later, Miranda finished his call and started walking home across the alley.  He saw two Black men, in their early 20's or younger, running south down the alley.  The one in front was holding a gun.  The one in back was carrying a dark object, about a foot and a half wide, in both hands.  One of them was wearing a white T-shirt or tank top.

The one with the object went to a white pickup and put something under the tire.  "He then panicked and went towards the alley," where he met up with the one with the gun.  One of them picked the object back up.  They rattled the wrought iron fence.  They ran south, then east toward the fence again.

3.  *Mary Prestridge.*

Mary Prestridge, too, lived in the apartment complex.  Around 8:40 p.m., as she was leaving her apartment to go to the market, a Black man, aged 18 to 20 and "kind of tall," ran into the triangular area.  He looked around, under, and into a white pickup.

A second young Black man "came running down the alley and stopped and stuck his head around the corner and said something to [the first] man."  The first man then ran east and jumped over a gate.  The second man did not go with him, but Prestridge was not sure where he went.

6

### 4. *Second-Hand Statements of Unknown Witnesses.*

When Detective Michael Cover arrived at the scene, other officers told him that according to witnesses, two Black men — one holding a money tray — had jumped over the wrought iron fence.[3]

### D. *Defendant's Confession.*

About two weeks later, "[a]fter various investigations," Detective Cover interviewed defendant at the police department. In his opinion, defendant was not under the influence of any controlled substance. Defendant said he had last used PCP two days before the interview.

Defendant said that after he took "a couple of hits off" a "sherm," he and a friend decided to rob the I Street Market. He had shopped there; he knew Singh and Singh knew him.

They drove to the market. Defendant brought along a gun that he claimed to have found in a park. It was a .380 semiautomatic; he had loaded it with fully jacketed bullets.

They spent 10 or 15 minutes casing the store, going back and forth between the planter area and the front of the store, to look inside. When defendant saw there were no customers inside, he and his friend went in.

Defendant pulled out the gun and ordered Singh to go to the register and give him the money. Singh opened the register; defendant took out the money tray and put it in a

---

**3** Although this was hearsay if considered for its truth, there was no objection and the trial court gave no limiting instruction.

black bag. Singh said defendant's name — "Tory" — and defendant shot him once in the chest. He explained that he shot Singh because "he realized Sonny knew him." At that moment, defendant was in front of the counter, to the right of the register; Singh was behind the counter, between the register and the tobacco display.

According to defendant's account, he and his friend went out the front door, turned right (east), then turned right again (south) down an alley. At this point, the friend was holding the black bag; he turned left into an area where there were some trucks and tried to hide the bag by a truck. Defendant told him, "No, not here. Let's go."

They resumed running south down the alley. Then the friend turned left (east). Defendant ran west toward the Taco Bell. He threw the gun into a dumpster at the Taco Bell. He continued west to a friend's apartment and stayed there for a while before going home. He took the money out of the money tray, then threw both the money tray and the black bag into a dumpster by his apartment.

The money totaled $184. Defendant had planned to give his friend half but decided to give him only $60 because defendant "had done the killing."

Initially, defendant refused to identify his friend. Then he said his name was "Jax" and described him as a tall, thin Black male. Defendant refused to say any more about him because he did not want to be a "snitch."

Over defendant's objections, the trial court allowed Detective Cover to testify that he could tell from an interviewee's "body language and answers and how quickly they respond," "their tone, their inflection," "and a variety of other things," whether an

8

interviewee was telling the truth. He implied that defendant was telling the truth because his body language changed from "defensive" to "open" and "relaxed"; because he gave the same account three times, with "no discrepancies at all"; and because he gave specific details that he would not have known if he was not present.

Detective Cover left defendant in a room with a second person who had been arrested with him. Defendant said "he had shot Sonny," and now he would be a "big man" in jail and "nobody would . . . fuck with him." (Inner quotation marks omitted.) "He also said that he had told the detective that he had used PCP at the time, even though he hadn't, because it would give him an alibi of temporary insanity and because of that he would only do two years in prison for the homicide."

The police searched the area around the Taco Bell, including the dumpster, but did not find a gun.

In a search of defendant's room, the police found, tucked between the mattress and the box spring, a newspaper article about the killing. It said nothing about the type of gun, the type of bullets, the number of shots, the victim's wounds, or which way the robbers ran. It incorrectly said the money tray had been found under a truck in the alley.

Defendant's father testified that he showed defendant the newspaper article and asked, "Do you know anything about this[? M]ight have been somebody you know." Defendant "grabbed it," looked at it, and kept it.

9

II

STATEMENT OF THE CASE

A.    *The Relevant Instructions*.

In 1996, at trial, the jury was instructed:

"Every person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of a robbery or a burglary is guilty of the crime of murder in violation of Section 187 of the Penal Code.

"In order to prove such crime each of the following elements must be proved:

"1.  A human being was killed.

"2.  The killing was unlawful, and

"3.  The killing was done with malice aforethought or occurred during the commission or attempted commission of a robbery or a burglary."  (CALJIC 8.10 [1994 rev.].)

"In this case the prosecution has asserted two separate theories of first degree murder:  first degree felony murder, and willful, deliberate, and premeditated murder."

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree."  (CALJIC 8.20 [5th ed.].)

"The unlawful killing of a human being[,] whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery or burglary, or as a direct causal result of the crime of robbery [*sic*; omitting burglary] is murder of the first degree when the perpetrator had the specific intent to commit the crime of robbery or burglary."  (CALJIC 8.21 [5th ed.].)

B.      *The Prosecutor's Arguments*.

In closing argument, the prosecutor took it for granted that defendant was the shooter.  However, he did argue that defendant's confession was true, because defendant knew that the murder weapon was a .380-semiautomatic handgun and knew that the bullet was fully jacketed; defendant also correctly stated where the shooter was standing, the number of shots fired, the location of the victim's wound, and the location where the victim fell.

In discussing the felony-murder rule, the prosecutor continued to assume that defendant was the shooter.  Thus, he did not argue that under the felony-murder rule, defendant was guilty of first degree murder *even if someone else was the shooter*.  However, he did argue that under the felony-murder rule, defendant was guilty of first degree murder *even if he did not intend to kill*:  "The unlawful killing of a human being whether intentional, unintentional, or accidental.  It doesn't have to be on purpose, under felony-murder.  During the commission of a robbery or burglary."

11

C.      *Trial Counsel's Arguments*.

Trial counsel argued that defendant was not involved in the crimes at all. Defendant's confession was false; he confessed because he wanted to be "a big man with his friend on the street," he was under the influence of PCP, and he mistakenly believed he could be sentenced to as little as two years. He could have gotten the details of his confession from the newspaper article, "from somebody on the street," by logical inference, or by lucky guesswork. Some of the details of his confession were incorrect, such as his description of his route away from the scene. Trial counsel also noted that none of the eyewitnesses had identified defendant.

D.      *Conviction and Appeal*.

The jury found defendant guilty of first degree murder (§ 187, subd. (a), former § 189), with robbery murder and burglary murder special circumstances (former § 190.2, subd. (a)(17)(i), (a)(17)(vii)); second degree robbery (§ 211); and second degree burglary (§ 459). On each count, a personal firearm use enhancement (§ 12022.5, subd. (a)) (firearm enhancement) was found true. He was sentenced to a total of 35 years to life. (See § 190.5, subd. (b) [penalty for special circumstances murder committed at 16 or 17 is either life without parole or 25 years to life].)

In defendant's direct appeal, we affirmed the judgment. (*People v. Bratton* (June 4, 1998, E019605) [nonpub. opn.].) Defendant argued that the trial court erred by allowing Detective Cover to testify that (1) he could tell whether a suspect was telling the

12

truth, and (2) defendant was telling the truth. We held that this was error, but it was harmless in light of the other evidence that defendant was telling the truth.

E.     *Section 1172.6 Petition.*

In 2021, defendant filed a petition to vacate the murder conviction pursuant to section 1172.6. The trial court appointed counsel for him.[4] The People filed an informal response, arguing that defendant was ineligible for relief because he was the actual killer.

At a prima facie hearing, the trial court took judicial notice of the entire case file. After hearing argument, it denied the petition; it ruled that our opinion in defendant's direct appeal established that he was the actual killer.

III

SECTION 1172.6

Subject to exceptions for killings in a heat of passion or in unreasonable self-defense (§ 192, subd. (a)), a person who intentionally and unlawfully kills another person is guilty of murder. (§§ 187, subd. (a), 188, subd. (a)(1).) If the killing is willful, deliberate, and premeditated, the murder is of the first degree. (§ 189, subd. (a).)

In addition, under the felony-murder rule, as it stood in 1995, a killing perpetrated in the commission or attempted commission of a specified felony — including robbery and burglary — was also first degree murder. (Former § 189, subd. (a).) This was true even if the defendant was not the actual killer, and even if the defendant and/or the actual

---

**4**      It appointed the same attorney who had represented defendant at sentencing 26 years earlier.

13

killer had no intent to kill. "'Under the felony-murder rule those who commit enumerated felonies [we]re "'strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony.'"' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 923.)

In 2018, the Legislature limited the scope of the felony murder rule. (§ 188, subds. (e), (f), Stats. 2018, ch. 1015, § 2.) The rule now applies to a person if and only if either:

"(1) *The person was the actual killer*.

"(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e), italics added.)[5]

At the same time, the Legislature also enacted section 1172.6. Section 1172.6 allows persons (1) convicted of murder, (2) who may have been convicted under the old felony murder rule, and (3) who claim they could not be convicted under the new felony murder rule, to petition to vacate the conviction. (§ 1172.6, subd. (a).) If the petition is facially sufficient — i.e., if it alleges each of these three criteria — the trial court must

---

[5]   Or — we note for completeness, although it is not relevant here — unless the person knew or should have known that the victim was a police officer acting in the course of his or her duties. (§ 189, subd. (f).)

14

"hold a hearing to determine whether the [defendant] has made a prima facie case for relief." (§ 1172.6, subd. (c).)

Although it is not express in the statute, the Supreme Court has held that, at the prima facie hearing, the trial court can consider the record of conviction "to distinguish petitions with potential merit from those that are clearly meritless." (*People v. Lewis* (2021) 11 Cal.5th 952, 971 (*Lewis*); see *id*., at pp. 970-972.) At the prima facie stage, "'[a] court should not reject the [defendant's] factual allegations on credibility grounds . . . .' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the [defendant].'" [Citation.]" (*Ibid*.)

If the trial court finds a prima facie case, it must hold an evidentiary hearing. (§ 1172.6, subd. (d).) At the evidentiary hearing, "the burden of proof [is] on the prosecution to prove, beyond a reasonable doubt, that the [defendant] is guilty of murder" even under current law. (§ 1172.6, subd. (d)(3).) If the prosecution does not carry this burden, the murder conviction must be vacated. (*Ibid*.)

We review the denial of a petition at the prima facie stage independently. (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 933.)

IV

RELIANCE ON OUR PREVIOUS OPINION

Defendant contends that the trial court erred by relying on the facts stated in our previous opinion.

15

Section 1172.6 was amended, effective January 1, 2022, so as to add the following italicized language: "At the hearing to determine whether the [defendant] is entitled to relief, . . . [*t*]*he court may . . . consider the procedural history of the case recited in any prior appellate opinion.*" (Former § 1170.95, subd. (d)(3), Stats. 2021, ch. 551, § 2, italics added.)

On February 16, 2022, we held that by *allowing* consideration of " 'the procedural history' " in a prior appellate opinion, the Legislature intended to *prohibit* consideration of "the factual summar[y]" in a prior appellate opinion. (*People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*); accord, *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9.) And "[i]f such evidence may not be considered at an evidentiary hearing to determine a petitioner's ultimate eligibility for resentencing, we fail to see how such evidence could establish, as a matter of law, a petitioner's ineligibility for resentencing at the prima facie stage." (*People v. Flores* (2022) 76 Cal.App.5th 974, 988, fn. omitted (*Flores*).)

Nevertheless, on March 4, 2022, at the prima facie hearing, the trial court relied on the statement of facts in our prior opinion in finding that defendant was the actual killer.

Arguably, trial counsel forfeited defendant's present contention by failing to raise it below. However, " " "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence." " [Citation.]" (*People v. Perez* (2020) 9 Cal.5th 1, 7-8.) Here, forfeiture is a close question; it turns on whether, by March 4, competent and

16

knowledgeable counsel would have been aware of the January 1 amendment and our February 16 opinion (which was not yet final). (See *ibid*.)

The People, however, do not argue that there was a forfeiture; thus, defendant has not had the opportunity to brief the forfeiture question. We therefore deem the People to have — so to speak — forfeited any forfeiture. (See *People v. Tousant* (2021) 64 Cal.App.5th 804, 824, fn. 9; *In re P.A.* (2012) 211 Cal.App.4th 23, 32, fn. 6.)

Under *Clements* and *Flores*, the trial court erred. The People even concede the error. They argue only that the error was harmless because the record of conviction conclusively establishes that the jury found that defendant was the actual killer. We therefore turn to this issue.

V

EVIDENCE THAT DEFENDANT WAS NOT THE SHOOTER

Defendant contends that there is substantial evidence in the record of conviction that he was not the shooter.

It is not entirely clear how this contention fits into his overall view of the case. He frames it as a contention that he made a prima facie case for relief. As such, it seems to be a preemptive contention that the trial court's error in relying on our previous opinion was not harmless. The People do not argue, however, that the error was harmless *because* there was no *evidence* that defendant was not the shooter.

We discuss this contention anyway because it is relevant to defendant's separate contention that his trial counsel had an incentive not to contest whether he was the

17

shooter.  (See part VI.B, *post*.)  If the evidence that defendant was not the shooter was weak, that would tend to show that trial counsel chose not to contest the issue for that reason alone.  If, on the other hand, the evidence was strong, that would tend to show that (as defendant argues) trial counsel nevertheless chose not to contest the issue for some overriding tactical reason.

There was considerable evidence that defendant *was* the shooter.  As the prosecutor argued, his confession, with a few exceptions, matched the eyewitnesses' accounts as well as the physical evidence.  Trial counsel argued valiantly that defendant gave a false confession; however, once the jury rejected this, presumably it would conclude that he confessed truthfully *both* to being present *and* to being the shooter.

Defendant asserts, however, that "there was ample basis for reasonable doubt that [his] confession to being the gunman was the truth," in several respects.

He notes that he evidently lied about going through the Taco Bell and dumping the gun there.  He claims this could mean that he "never had the gun in the first place."  That conclusion is speculative.  It is more likely to mean that he knew exactly where the gun was, and he was trying to prevent the police from finding it.

He also notes that, when Lopez saw three men standing in the planter before the robbery, the tallest one had something shiny in his hand.  Defendant concludes that, at five feet six inches tall, he was not the robber holding the gun.  However, absent the heights of the other robbers, this is speculative; if they, too, were juveniles, they may

18

have been shorter.[6]  In any event, it would not be surprising if the gun changed hands while the robbers were standing in the planter; defendant and the others were taking turns peeking into the store, and presumably they did not want to be seen holding a gun as they did so.

Next, defendant notes that his account of who was carrying the money tray was unconvincing.  He claimed that he pulled out the gun, took the money tray, and put it in a black bag.  As he argues, however, it is more likely that one robber held a gun on the victim while a second robber fussed with the bag and the money tray.  Even in defendant's account, his friend was holding the money tray as they ran down the alley.  In addition, an unknown witness saw a robber with a money tray jump over the wrought iron fence; this cast doubt on defendant's claim that the money tray was in a black bag, as well as on his claim that he had the money tray when he got home.

None of this, however, went to whether defendant was the shooter.  At best, it showed that his confession was not entirely truthful.  However, that was equally relevant to whether he was present at all.  It did not tend to show that, *even if* he was present, he was not the shooter.

---

**6**    Defendant also argues that one of the robbers was taller than he, because Prestridge described the robber who ran up to the white pickup as "kind of tall." However, Miranda testified that the robber who ran up to the white pickup did *not* have the gun.

Defendant then notes that he said there were only two robbers when eyewitnesses saw three.[7] Again, this does not specifically go to whether defendant was the shooter; it goes to the truthfulness of his confession as a whole.

It does tend to show that defendant was trying to protect his cohorts. In defendant's view, the very fact that he was trying to protect the third robber is some evidence that the third robber was the shooter. However, he was also trying to protect the second robber; he refused to identify him except as "Jax." They could not *both* have been the shooter. Thus, it appears that he was trying to protect his cohorts simply because (as he said) he did not want to be a snitch.

Last but not least, defendant concedes that his claim that he found the gun in the park was not very credible. He asks us to infer, however, that he had to lie about where the gun came from, because — not being the shooter — he did not know. But it is also inferable that he was protecting the person he got the gun from. Indeed, as we already know he was protecting his accomplices, this is a more plausible inference.

Defendant argues overall that the evidence is consistent with a scenario in which he participated in a robbery with older cohorts (possibly fellow gang members)[8] and took the fall for a murder actually committed by one of them because he was a juvenile. This

---

[7] In defendant's account, he and his friend drove to the market but ran away on foot. Presumably, the third robber drove their vehicle away from the scene.

[8] In an Evidence Code section 402 hearing, outside the presence of the jury, defendant admitted being a gang member.

20

is pure speculation. It appears that he confessed truthfully to both the robbery and the murder but fudged any details that would have inculpated his cohorts.

Are defendant's inferences that he was not the shooter illogical or impossible? No. Thus, we agree that there was substantial evidence — meaning, in this context, evidence sufficient to raise a reasonable doubt — that he was not the shooter. But were these inferences likely to convince a jury — once it found that defendant had truthfully admitted to police that he robbed and burglarized the market — that he might have been lying when he said he shot the clerk? No, not likely.

We will return to this point in part VI.B, *post*.

VI

THE PRECLUSIVE EFFECT OF THE JURY'S FINDINGS

The People argue that the record of conviction conclusively establishes that defendant was the actual killer. They assert that the instructions on both deliberate and premeditated murder and felony murder required the jury to find that defendant was the actual killer. They also point to the fact that the jury found the personal firearm enhancement true.

Defendant argues, however, that the jury's findings are not conclusive, because they do not meet the requirements for issue preclusion.

"In general, whether a prior finding will be given conclusive effect in a later proceeding is governed by the doctrine of issue preclusion, also known as collateral estoppel. [Citations.]" (*People v. Strong* (2022) 13 Cal.5th 698, 715 (*Strong*).)

The People respond that the rule that the trial court can treat matters in the record of conviction as conclusive at the prima facie hearing (see *Lewis*, *supra*, 11 Cal.5th at p. 971) is a separate and distinct legal principle, which operates independently of rules of issue preclusion. But if that rule has some source other than issue preclusion, the People do not explain what it is. As we noted in part III, *ante*, it cannot be found in the text of section 1172.6.

Defendant aptly cites *Strong*. There, the question was whether a true finding on a felony-murder special circumstance — which required that the defendant be a major participant in the underlying felony and acted with reckless indifference to human life — established that the defendant was ineligible for relief under section 1172.6. (*Strong*, *supra*, 13 Cal.5th at p. 703.) The Supreme Court analyzed this question under standard issue preclusion principles. (*Id*. at pp. 715-721.) We are bound to follow that approach here. (See *People v. Perez*, *supra*, 9 Cal.5th at p. 13.)[9]

"[I]ssue preclusion bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is

---

[9] Because we reject on the merits the People's position that standard issue preclusion principles do not apply here, we do not address defendant's argument that the People are judicially estopped from taking this position.

22

sought must be the same as, or in privity with, the party to the former proceeding.' [Citation.]"  (*Strong*, *supra*, 13 Cal.5th at p. 716.)

"And while these threshold requirements are necessary, they are not always sufficient . . . ."  (*Strong*, *supra*, 13 Cal.5th at p. 716.)  There are exceptions when (1) "the party sought to be precluded . . . did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action," or (2) "it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action . . . ."  (Rest.2d Judgments, § 28(5).)  There is also an exception (3) "when there has been a significant change in the law since the factual findings were rendered that warrants reexamination of the issue."  (*Strong*, *supra*, 13 Cal.5th at p. 716.)

A.      *"Actually Litigated."*

Defendant contends that whether he was the shooter was not actually litigated.

"An issue is actually litigated '[w]hen [it] is *properly raised*, by the pleadings or otherwise, and is submitted for determination, and is *determined* . . . .  [Citation.]" (*People v. Sims* (1982) 32 Cal.3d 468, 484 (*Sims*); accord, Rest.2d Judgments, § 27, com. d.)  By contrast, "[a]n issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so; nor is it actually litigated if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is

23

adduced at trial; nor is it actually litigated if it is the subject of a stipulation between the parties." (Rest.2d Judgments, § 27, com. e.)

"Although '"[a] former judgment is not a collateral estoppel on *issues which might have been raised but were not*; just as clearly, it is a collateral estoppel on issues which were raised, *even though some factual matters or legal arguments which could have been presented were not*."' [Citations.]" (*People v. DeMontoya* (2022) 85 Cal.App.5th 1159, 1180 (*DeMontoya*).) "[T]he imposition of an additional requirement that the prior judgment also be supported by some particular level of litigation activity would be a novel and troublesome departure from settled law." (*State Farm Mut. Auto. Ins. Co. v. Superior Court* (1989) 211 Cal.App.3d 5, 15, fn. 12.)[10]

Under the definition in *Sims*, whether defendant was the shooter was actually litigated. The firearm enhancements were alleged in the information; they were submitted to the jury for determination; and the jury made a true finding on them. In addition — if more were needed — the prosecution introduced evidence that defendant was the shooter. True, trial counsel did not introduce evidence nor argue that defendant was *not* the shooter, but he had the opportunity to do both.

Defendant uses a different definition, which he cites to *Hardy v. America's Best Home Loans* (2014) 232 Cal.App.4th 795, 806 (*Hardy*): "'Whether an issue was actually litigated in a prior action . . . is generally determined by ascertaining whether the parties

---

[10] Similarly, in the federal courts, "preclusion applies to any issue framed by the pleadings and not withdrawn, even though it has not been raised at trial in any way." (18 Wright & Miller, Fed. Prac. & Proc. (3d ed. 2022 update) Jurisdiction § 4419.)

to the original action disputed the issue and whether that issue subsequently was resolved by the court entertaining the action.'"

*Hardy* did not say this. Rather, like *Sims*, it said: "An issue is 'actually litigated' when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined . . . .' [Citations.]" (*Hardy*, *supra*, 232 Cal.App.4th at p. 806.) It then added a "see" cite to Corpus Juris Secundum, and quoted — in brackets — the rather different definition on which defendant relies. (*Hardy*, *supra*, 232 Cal.App.4th at p. 806.) Thus, *Hardy* is by no means a holding that California actually follows this different definition.

In any event, the two definitions can be harmonized. In the criminal context, an issue is "disputed" when it is raised by the accusatory pleading and the defendant does not admit it. In that event, the People are put to their proof; if they fail to prove the issue in their favor — generally, beyond a reasonable doubt — it must be resolved in the defendant's favor, regardless of whether the defendant actively contests it.

In *Sims* itself, a county proposed to reduce Sims's welfare benefits, alleging that she had obtained past benefits fraudulently. Sims requested a " 'fair hearing' " before a Department of Social Services (DSS) hearing officer. (*Sims*, *supra*, 32 Cal.3d at p. 473.) At the fair hearing, the county claimed the hearing officer had no jurisdiction and declined to present any evidence. The hearing officer ruled that the DSS did have jurisdiction and that there had been no fraud. (*Id*. at p. 474.)

Meanwhile, the People had charged Sims with criminal welfare fraud. (*Sims*, *supra*, 32 Cal.3d at p. 473.) On Sims's motion, the trial court dismissed the criminal proceeding, based on issue preclusion. The People appealed. (*Id*. at p. 474.)

The Supreme Court affirmed. (*Sims*, *supra*, 32 Cal.3d at p. 490.) It held, as relevant here: "[T]he welfare fraud issue was 'properly raised' by [Sims]'s request for a fair hearing . . . . After the fair hearing, the controversy was 'submitted' to the DSS for a 'determination' on the merits. The hearing officer found that the County had failed to prove that respondent had fraudulently obtained welfare benefits.

"Thus, it is clear that [Sims]'s guilt or innocence of welfare fraud was actually litigated at the DSS fair hearing. The County's failure to present evidence at the hearing did not preclude the fraud issue from being 'submitted' to and 'determined' by the DSS." (*Sims*, *supra*, 32 Cal.3d at p. 484.)[11]

*Sims* is all but on point. Indeed, the facts here present an even stronger case for issue preclusion: In *Sims*, the county claimed a legal justification for its failure to present evidence, namely the DSS's supposed lack of jurisdiction. Here, by contrast, defendant did not claim any such legal justification for his failure to contest the issue of whether he was the shooter. He had a full and fair opportunity to contest it; his trial counsel simply chose not to.

---

[11]    Justice Kaus, dissenting, would have held that the welfare fraud issue was not actually litigated. (*Sims*, *supra*, 32 Cal.3d at pp. 490-492 [dis. opn. of Kaus, J.].) This confirms that the majority's contrary ruling was a carefully considered holding rather than dictum.

Case after case has held that an issue can be actually litigated, notwithstanding one party's failure to contest it.  (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 869 (*Murray*) ["'[i]t is the *opportunity to litigate* that is important . . .  not whether the litigant availed himself or herself of the opportunity.'"], and cases cited at pp. 869-875; accord, *Dailey v. City of San Diego* (2013) 223 Cal.App.4th 237, 257-258.)

Defendant argues that *Sims*, *Murray*, and the other cases cited *ante* are distinguishable because they all involved defensive collateral estoppel (i.e., a defendant's assertion of collateral estoppel against a plaintiff), whereas this case involves offensive collateral estoppel (i.e., a plaintiff's assertion of collateral estoppel against a defendant).  The cases themselves, however, do not draw this distinction.  The Restatement definition of "actually litigated" is not limited to the defensive context.  (Rest.2d Judgments, § 27, com. d.)  And we see no reason why the two contexts would call for different rules.

*DeMontoya*, *supra*, 85 Cal.App.5th at page 1180 applied the *Sims* standard in the context of offensive collateral estoppel.  It held that the denial of the defendant's 2018 motion to withdraw her guilty plea operated as offensive collateral estoppel, requiring the denial of her 2021 motion to withdraw the same guilty plea.  The defendant argued that in the 2018 proceeding, she did not actually litigate the claim of mental health issues that she raised in the 2021 proceeding.  (*Ibid*.)  The appellate court cited *Sims* and relied on its standard of " 'actually litigated.' "  (*Id.* at pp. 1180-1181.)  It noted that the defendant had claimed her mental health as an issue in 2018; "[s]he just did not provide sufficient

evidence in support of her first motion . . . ." (*Id*. at p. 1181.)  Therefore, that issue had been actually litigated.  (*Ibid*.)[12]

Defendant relies on *People v. Gonzalez* (2021) 65 Cal.App.5th 420, review granted August 18, 2021, review dismissed September 28, 2022, S269792 (*Gonzalez*).  His reliance is understandable, as *Gonzalez* is on point.[13]

Gonzalez had been convicted of first degree murder, with a robbery-murder special circumstance.  (*Gonzalez*, *supra*, 65 Cal.App.5th at p. 426.)  His section 1172.6 petition was denied.  (*Ibid*.)  When he appealed, the People argued that he was "ineligible for relief as a matter of law because his murder conviction included a robbery special circumstance . . . ."  (*Id.* at p. 429.)  The appellate court disagreed, for a number of alternative reasons.  (See *id*. at pp. 429-431.)  Among other things, it held:  "There is no claim preclusion here because Gonzalez did not challenge the prosecution's cause of action on the special circumstance."  (*Id*. at p. 433.)  "[D]efense counsel did not 'actually litigate' the robbery special circumstance.  Instead, he argued Gonzalez was not guilty of murder at all.  Because Gonzalez made no effort to litigate the special circumstance, and had no reason to do so, the 'actually litigated' element of collateral estoppel is not satisfied by the jury's true finding."  (*Ibid*.)

---

**12**    It could be argued that *DeMontoya* involved defensive, not offensive, collateral estoppel because, with respect to her motion to withdraw her plea, DeMontoya was in the position of a plaintiff, and the People were in the position of a defendant.  Even if so, defendant is in the same position here with respect to his petition.

**13**    His appellate counsel was also counsel for the appellant in *Gonzalez*.

28

Despite having the utmost respect for our sister court, we must decline to follow *Gonzalez*. It cited no authority for its conclusion, other than a single Supreme Court case laying out the elements of issue preclusion generally. (*Gonzalez, supra*, 65 Cal.App.5th at p. 433, citing *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) It did not cite *Sims* nor any of the many other cases that have defined "actually litigated." It devoted little analysis to the issue, which it reached only in the alternative to its other reasons for rejecting the People's reliance on the robbery-murder special circumstance. We therefore reluctantly conclude that *Gonzalez* simply got it wrong.

In sum, then, we hold that whether defendant was the shooter was actually litigated for purposes of issue preclusion.

B.     *Incentive to Contest*.

Defendant contends that his trial counsel had no incentive to contest[14] whether he was the shooter.

As mentioned, trial counsel argued that defendant was not involved in the crimes at all. According to defendant, arguing that *even if* he participated in the crimes he was not the shooter would have undermined this strategy. He claims that once the jury found that he intentionally participated in a robbery or burglary, it followed *automatically* that (1) he was guilty of felony murder and (2) the felony-murder special circumstances were

---

[14]     This issue preclusion exception is often phrased in terms of "incentive to litigate." (E.g., *Mueller v. J. C. Penney Co.* (1985) 173 Cal.App.3d 713, 720.) However, that implies that, if a party had no incentive to litigate, then the issue was not actually litigated, which is incorrect. (See part VI.A, *ante*.) We prefer the wording "incentive to contest."

29

true. Thus, making such an argument might have lowered the risk that the firearm enhancements would be found true; however, it would have increased the risk of being found guilty of first degree murder with special circumstances. And in light of the severity of the sentence for that crime — either life without the possibility of parole, or 25 years to life (§ 190.5, subd. (b)) — the risk of an additional three-, four-, or 10-year term on the firearm enhancement (§ 12022.5, subd. (a)) was worth taking. Defendant concludes that his trial counsel had no incentive to contest the firearm enhancements.

There are four problems with this analysis.

First, there was a third way out of the dilemma: All trial counsel had to do was move to bifurcate the firearm enhancements. Then he could argue in the first phase that defendant did not participate in the crimes; and, if the jury resolved that issue against defendant, he could argue in the second phase that defendant was not the shooter.

Second, trial counsel would not have viewed an enhancement term of up to 10 years as de minimis. It must be remembered that defendant was 16 when he was arrested. He was entitled to some conduct credits, although they were limited to 15 percent (§ 2933.1, subds. (a), (c)); section 2933.2, denying conduct credits to murderers entirely, had not yet gone into effect. (Stats. 1996, ch. 598, § 3.) In any event, even without *any* conduct credits, a sentence of 25 years to life would have made him eligible for parole when he was 41. The difference between parole eligibility at 41 and at 51 is substantial.

Defendant argues that trial counsel would have discounted this difference in parole eligibility because, at the time, "it was perceived" that prisoners sentenced to life were

unlikely ever to gain parole. We doubt that we can take judicial notice of this. Even if it was true at the time, however, trial counsel would have recognized that its truth was a function of the politics of the governor and of the parole board, which can swing back and forth over a period as long as 25 years.

Third, defendant misstates the effect of the instructions; they did not automatically require the jury to find him guilty of felony murder if he was guilty of robbery or burglary.

When defendant was tried, the felony-murder rule had three aspects. First, it was a rule of strict liability: It made a killer guilty of murder even when he or she had no intent to kill. Second, it was a rule of vicarious liability: It made a nonkiller guilty of murder. (*People v. Cavitt* (2004) 33 Cal.4th 187, 196; *People v. Pulido* (1997) 15 Cal.4th 713, 720.) Taking these aspects together, it made *either* a killer *or* a nonkiller guilty of murder, regardless of any participant's intent to kill. It also had the third aspect, not particularly relevant here, of fixing the degree of the murder as first degree.

Here, however, the jury was *not* instructed on the felony-murder rule as a theory of *vicarious* liability. It was instructed on it *only* as a rule of *strict liability* and of *degree-fixing*.

Specifically, it was instructed that "[e]*very person who unlawfully kills* a human being . . . during the commission or attempted commission of a robbery or a burglary is guilty of the crime of murder." (CALJIC 8.10 [1994 rev.], italics added.) It was also instructed that "[t]he unlawful killing of a human being, whether intentional,

31

unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery or burglary, or as a direct causal result of the crime of robbery [*sic*], is murder of the first degree when the perpetrator had the specific intent to commit robbery or burglary." (CALJIC No. 8.21 [5th ed. 1988].)

It was *not* given CALJIC No. 8.27 (6th ed. 1996), which would have stated: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of [robbery or burglary], all persons, who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree."

Thus, the instructions indicated that to be guilty of murder at all, defendant had to be the actual killer.

Under the instructions as given, if trial counsel conceded that defendant participated in the robbery and burglary, it did not follow that defendant was guilty of felony murder. Trial counsel therefore could safely argue that, even if defendant was present, he was not the shooter, without significantly increasing defendant's risk of being convicted of murder.

Fourth, as discussed in part V, *ante*, the evidence that defendant was not the shooter was weak and largely speculative. Trial counsel could well have decided not to

32

raise the issue for this reason alone. "Counsel may have wished to concentrate on the argument he viewed as more persuasive . . . rather than potentially confusing the issues and detracting from his credibility with the jury by making a nonpersuasive argument. [Citation.]" (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1159.)

We therefore conclude that trial counsel had an adequate incentive to contest whether defendant was the shooter.

Defendant cites *Haring v. Prosise* (1983) 462 U.S. 306 for the proposition that issue preclusion does not apply unless the party to be precluded had "'an adequate incentive to litigate "to the hilt" the issues in question.' [Citation.]" (*Id*. at p. 311.) However, that was not the Supreme Court's own legal reasoning; rather, it was summarizing the opinion of the court below in the case that it was reviewing. It neither accepted nor rejected the "to the hilt" language. It is true that it affirmed the court below, so that the lower court's opinion itself is precedential. In support of its "to the hilt" language, however, the lower court provided only a "see generally" citation to the Second Restatement. (*Prosise v. Haring* (4th Cir. 1981) 667 F.2d 1133, 1141.) Later courts have clarified that, "When one party introduces evidence on a dispositive issue of fact, and an adverse party with opportunity and motive to contest the presentation chooses not to, the ensuing finding is entitled to the same respect as one litigated to the hilt. [Citation.]" (*Harris Trust and Sav. Bank v. Ellis* (7th Cir. 1987) 810 F.2d 700, 705, italics added.)

Defendant also relies on *In re Sokol* (2d Cir. 1997) 113 F.3d 303. There, Sokol was found guilty of Medicaid fraud between $50,000 and $1 million. The trial court

ordered him to pay $222,255.38 in restitution; it refused to hold a hearing regarding the amount. The state then brought a civil action against Sokol for treble damages. (*Id*. at p. 305.) After Sokol declared bankruptcy, the bankruptcy court ruled that the treble damages claim was nondischargeable but also that the amount of the claim was not established, because it had not been actually litigated. The district court affirmed. (*Id*. at pp. 305-306.)

The Second Circuit agreed. It applied the New York law of issue preclusion, which required that there have been a full and fair opportunity to litigate the issue. (*In re Sokol*, *supra*, 113 F.3d at p. 307.) "Factors to be considered include, *inter alia*: 1) the nature of the forum and the importance of the claim in the prior litigation; 2) the incentive to litigate and the actual extent of litigation in the prior forum; and 3) the foreseeability of future litigation (because of its impact on the incentive to litigate in the first proceeding). [Citation.]" (*Ibid*.)

Regarding the first factor, the court concluded that "[t]he nature and importance of the issues at trial and in bankruptcy court are . . . dissimilar." (*In re Sokol* , *supra*, 113 F.3d at p. 307.)

Regarding the second factor, it said: "Sokol not only had no incentive to litigate damages, he did not actually do so. His entire trial strategy was dedicated to proving his innocence, not to proving a lesser degree of damages. . . . While the State presented evidence as to the amount of loss . . . , that evidence was minimal: . . ." (*In re Sokol*,

*supra*, 113 F.3d at p. 307.)  It also noted that he had been denied a hearing on the amount of restitution.  (*Id*. at pp. 307-308.)

It concluded:  "Although the third of the relevant . . . factors weighs against Sokol because the civil proceeding was foreseeable at the time of the criminal trial, we nevertheless are convinced that he has proved the absence of a full and fair opportunity to litigate . . . as defined by New York law."  (*In re Sokol*, *supra*, 113 F.3d at p. 308.)

*Sokol* is of limited assistance, as California does not use a similar multifactor balancing test.  However, to the extent that it sheds light on the meaning of incentive to contest, it is not on point.  At trial, as long as the fraud was between $50,000 and $1 million, Sokol had no incentive to litigate the exact amount; and at sentencing, he was not allowed to litigate it at all.  Here, by contrast, as already discussed, the evidence that defendant was the shooter was hardly "minimal"; moreover, trial counsel had both the incentive and the ability to litigate the personal firearm enhancements.

Defendant also contends that issue preclusion does not apply because it was not foreseeable that section 1172.6 would be enacted and would alter the significance of the firearm enhancements:  "[T]he stakes in the first proceeding were relatively minor compared with those in the second, and the affected issue's importance in the second proceeding was unforeseeable in the first."  However, this contention is necessarily related to his contention that his trial counsel had no incentive to contest whether he was the shooter.  According to the Restatement, such unforeseeably altered stakes are an exception to issue preclusion only "if that lack of foreseeability may have contributed to

35

the losing party's failure to litigate the issue fully." (Rest.2d Judgments, § 28, com. i.) For the reasons already discussed, trial counsel had ample incentive to contest whether he was the shooter. It appears that he did not do so simply because such a contest was unlikely to succeed.

C.    *Change in the Law*.

1.    *Section 1172.6 as a change in the law*.

Defendant contends that section 1172.6 itself is a change in the law so significant that it warrants relitigation.

The "change in the law" exception to issue preclusion "ensures basic fairness by allowing for relitigation where 'the change in the law [is] such that preclusion would result in a manifestly inequitable administration of the laws.' [Citation.] It also reflects a recognition that in the face of this sort of legal change, the equitable policies that underlie the doctrine of issue preclusion — 'preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation' [citation] — are at an ebb." (*Strong*, *supra*, 13 Cal.5th at p. 717.)

If we were to accept defendant's argument, that would mean the prosecution could *never* rely on issue preclusion in proceedings under section 1172.6. However, the courts of appeal have held that it can.[15] (E.g., *People v. Lopez* (2022) 78 Cal.App.5th 1, 14;

_____

[15]    The only disagreement was as to whether a jury's finding that a petitioner was a "major participant" and acted "with reckless indifference to human life" was conclusive even after the Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified

*[footnote continued on next page]*

*People v. Farfan* (2021) 71 Cal.App.5th 942, 953-956; *People v. Daniel* (2020) 57 Cal.App.5th 666, 678, review granted Feb. 24, 2021, review dism. Dec. 1, 2021, S266336; *People v. Galvan* (2020) 52 Cal.App.5th 1134, 1140, disapproved on other grounds in *Strong*, *supra*, 13 Cal.5th at p. 718, fn. 3; *People v. Tarkington* (2020) 49 Cal.App.5th 892, 899, review granted Aug. 12, 2020, review dism. Nov. 10, 2021, S263219, disapproved on other grounds in *Lewis*, *supra,* 11 Cal.5th at pp. 961-970.)  The Supreme Court implicitly held in *Lewis* that issue preclusion can apply, when it concluded that the trial court can deny a petition at the prima facie stage based on the record of conviction.  (*Lewis*, *supra,* 11 Cal.5th at pp. 970-972.)

In supplemental briefing, defendant denies taking this extreme position.  He cites *People v. Farfan*, *supra*, 71 Cal.App.5th 942 (*Farfan*) and *People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411 (*Gutierrez-Salazar*) as examples of cases in which he concedes that the "change in the law" exception would not apply.  *Farfan* and *Gutierrez-Salazar* both held that the jury's true finding on a felony-murder special circumstance was issue preclusive, because it required that the defendant either intended to kill or was a major participant in the underlying felony who acted with reckless indifference to human life.  (*Farfan*, at pp. 954-956; *Gutierrez-Salazar*, at pp. 419-420.)  Defendant argues that in these cases, there was "no record evidence" that the change in law could have altered the verdict, whereas in his case, there is.  However, in those cases, the

the meaning of these terms of art.  In *Strong*, the Supreme Court settled this disagreement by holding "no."  (*Strong*, *supra*, 13 Cal.5th at pp. 710, 715-718.)

37

defendants could have argued, just as defendant does here, that if only they had known that section 1172.6 was going to be enacted, they might have presented more, better, or different evidence.

The whole point of issue preclusion is that there is no need to look at the evidence. As the court said in *Farfan*, "The mere filing of a section [1172.6] petition does not afford the [defendant] a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding . . . . The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' [Citation.]" (*People v. Farfan*, *supra*, 71 Cal.App.5th at p. 947.)

Admittedly, in the cases we have cited, no one was arguing that the "change in the law" exception applied. "It is axiomatic that a case is not authority for an issue that was not considered. [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 110.)

However, after these cases had already been decided, the Legislature renumbered section 1172.6, without any change in wording. (Stats. 2022, ch. 58, § 10.) "'When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute.' [Citation.]" (*People v. Zambia* (2011) 51 Cal.4th 965, 976.)

We conclude that the Legislature intended that issue preclusion apply at the prima facie stage; thus, it also intended that the "change in law" exception *not* apply.

### 2. *Our previous opinion as a change in the law*.

Defendant also contends that our previous opinion constitutes a change in the law that warrants relitigation.

As mentioned, the trial court allowed Detective Cover to testify that he had ways of telling when an interviewee was telling the truth. Moreover, he implied that, in his opinion, defendant was telling the truth. In defendant's direct appeal, we held that this was error but harmless.[16] Thus, in any evidentiary hearing under section 1172.6, subdivision (d), Detective Cover's testimony to this effect would be excluded. Defendant concludes that this warrants relitigation.

Our previous opinion, however, was not a change *in the law*. Since at least 1982, it has been the law that a witness, whether lay or expert, cannot testify to an opinion that another person is telling the truth. (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39-40.) That is precisely why we held that the trial court *erred*. The fact that a previous trial court judgment was based, in part, on inadmissible evidence is not an exception to issue preclusion. "'[A]n erroneous judgment is as conclusive as a correct one.' [Citations.]" (*Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 975, fn. omitted.)

---

[16]    However, we also held that "Cover properly testified to his observations and perceptions . . . , including the facts that defendant's body language changed when he started to disclose the events of the robbery and murder and that defendant's story was consistent through three repetitions. In addition, Cover properly testified as to the circumstances that tended to corroborate defendant's story . . . ."

## VII

## DENIAL OF THE OPPORTUNITY TO TESTIFY

Defendant contends that the trial court erred by preventing him from offering new evidence, including his own testimony, at the prima facie hearing.

If a trial court finds a prima facie case, it must hold an evidentiary hearing, at which a defendant can introduce new evidence (§ 1172.6, subd. (d)(3)), including his or her own testimony. However, if the trial court denies the petition at the prima facie stage, it does not hold an evidentiary hearing at all. (§ 1172.6, subds. (c), (d)(1).) "[T]he prima facie inquiry . . . is limited." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) The parties are allowed to submit "briefings" (§ 1172.6, subd. (c)), but not evidence. The petitioner can make whatever factual allegations he or she wants, subject to the constraints of perjury, and those allegations must be deemed true (*Lewis*, at p. 971), so what would be the point of allowing the petitioner to submit evidence? The only thing the trial court can consider at the prima facie stage, besides the petition, is the record of conviction (see *Lewis*, at pp. 970-972) (and possibly other matters subject to judicial notice, though we need not decide that point).

In part VI, *ante*, we held that the jury's findings were preclusive; thus, they required the trial court to deny the petition at the prima facie stage. It follows that defendant was not denied an opportunity to testify.

VIII

DISPOSITION

The order appealed from is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.